Mary C. Turke, *Admitted Pro Hac Vice*
TURKE & STRAUSS LLP
613 Williamson Street, Suite 201
Madison, WI 53703
Telephone: (608) 237-1775
mary@turkestrauss.com

Lynn A. Toops, *Pro Hac Vice Pending*
Lisa M. La Fornara, *Pro Hac Vice Pending*
COHEN & MALAD, LLP
One Indiana Square
Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ltoops@cohenandmalad.com
llafornara@cohenandmalad.com

[Additional Counsel Appear on Signature Page]

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Goodell and Kerri Wolski, individually and on behalf of a class of all persons and entities similarly situated, | Case No. 2:20-cv-01657-JJT |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| Van Tuyl Group, LLC, | |
| Defendant. | |

## I. PRELIMINARY STATEMENT

1.      Plaintiffs Brian Goodell and Kerri Wolski bring this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs.*, *LLC,* 132 S. Ct. 740, 745 (2012).

2.      Plaintiffs allege that Van Tuyl Group, LLC dba Berkshire Hathaway Automotive, Inc. ("Defendant") facilitated and are responsible for automated calls to

1

their cellphones and those of other class members, without their prior express written consent. In fact, Defendant has placed or directed that telemarketing telephone calls be placed to Plaintiffs and putative class members despite not implementing the policies and procedures required by law prior to making such calls.

3.      Plaintiffs and class members never consented to receive these calls. Defendant nonetheless engaged in a nationwide telemarketing campaign designed to sell their products to consumers. Because this telemarketing campaign placed calls to many thousands of potential customers *en masse*, Plaintiffs bring this action on behalf of a proposed nationwide class of other persons who received illegal telemarketing calls from or on behalf of Defendant.

## II. PARTIES

4.      Plaintiff Kerri Wolski is a resident of Mesa, Arizona, in this District.

5.      Plaintiff Brian Goodell is a resident of Mesa, Arizona, in this District.

6.      Defendant Van Tuyl Group, LLC is a Delaware limited liability company with its principal place of business at 8333 Royal Ridge Parkway, Suite 100 in Irving, Texas.

7.      Defendant holds itself out and does business as "Berkshire Hathaway Automotive." Defendant's website, http://www.vantuylgroup.com automatically redirects to https://www.berkshirehathawayautomotive.com/.

8.      Defendant has registered the trade name, "Berskhire Hathaway Automotive" with the Arizona Secretary of State and states the nature of its business is "CONSULTING SERVICES TO AUTOMOBILE DEALERSHIPS." Defendant's phone number for this registration is 972-536-2900. Area code 972 is associated with Irving, Texas, where its headquarters are located.

9.      Defendant is wholly owned by Berkshire Hathaway Automotive, Inc.

10.      Defendant or its agents makes telemarketing calls into this District, including to Plaintiffs.

### III.  JURISDICTION & VENUE

11.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the Plaintiffs' claims arise under federal law.

12.     Venue is proper under 28 U.S.C. § 1391(b)(2) because the calls that were initiated to Plaintiffs and the putative class that are the subject of the litigation were made into this District. As such, a substantial part of the events giving rise to the claims occurred in this District.

### IV.  TCPA BACKGROUND

13.     The TCPA was passed in 1991 to help prevent unwanted telephone calls and solicitations, provide power to consumers to prevent unwanted solicitations, and rein in unrestricted telemarketing. *See* 47 U.S.C. § 227, *et seq.*

14.     Relevant to this action, the TCPA provides private rights of action for two types of telemarketing-related conduct.

15.     First, Section 227(b) of the TCPA prohibits initiating a telemarketing call using an automatic telephone dialing system without the prior express written consent of the called party.

16.     "Prior express written consent" requires a signed writing that clearly authorizes the seller to deliver to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice. 47 C.F.R. § 64.1200(f)(8).

17.     This written agreement must clearly and conspicuously disclose that the calls would be made using an automatic telephone dialing system or an artificial or prerecorded voice, and that the person is not required to sign the agreement as a condition of purchasing any property, goods, or services. *Id.* at (f)(i)(A-B).

18.     A violation of § 227(b) carries statutory damages of $500 to $1,500 per call.

19.     Second, § 227(c) of the TCPA requires the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy

rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

20.     In this rulemaking proceeding, the FCC was instructed to "compare and evaluate alternative methods and procedures (including the use of … company-specific 'do not call systems …)" and "develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish purposes of this section." *Id.* at (c)(1)(A), (E).

21.     The first regulation to be issued under § 227(c) established company-specific "do not call" rules. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 F.C.C. Rcd. 8752 (Oct. 16, 1992) ("TCPA Implementation Order").

22.     The FCC found that "the company-specific do-not-call list alternative is the most effective and efficient means to permit telephone subscribers to avoid unwanted telephone solicitations." *Id.* at 8765, ¶ 23.

23.     However, recognizing that an honor system would probably be insufficient, the FCC found that it "must mandate procedures for establishing company-specific do-not-call lists to ensure effective compliance with and enforcement of the requirements for protecting consumer privacy." *Id.* at ¶ 24.

24.     These procedures are codified at 47 CFR 64.1200(d)(1)-(7).

25.     Specifically, § 64.1200(d) requires a company to keep a written policy, available upon demand, for maintaining a do-not-call list, train personnel engaged in telemarketing on the existence and use of its internal do-not-call list, and record and honor "do not call" requests for no less than five years from the time the request is made. 47 CFR § 64.1200(d)(1, 2, 3, 6).

26.     These policies and procedures prohibit a company from making telemarketing calls unless they have implemented these policies and procedures. 47 CFR 64.1200(d).

27.     Accordingly, all telemarketing calls violate the TCPA unless Defendant can demonstrate that it has implemented the required policies and procedures.

28.     Consent is irrelevant to § 64.1200(d).

29.     A violation of § 227(c) through 47 C.F.R. § 64.1200(d) carries statutory damages of $500 to $1,500 per call.

30.     Though some of these requirements mention "residential" telephones, they were all extended to cover calls to cellular telephones as well as residential telephones. 47 CFR § 64.1200(e).

## V.  FACTUAL ALLEGATIONS

**A.     Defendant**

31.     Defendant is a "person" as the term is defined by 47 U.S.C. § 153(39).

32.     Defendant's website, https://www.berkshirehathawayautomotive.com/about/history, says Defendant is one of the largest car dealership groups in America, operating 85 dealerships and 100 automotive franchises, making Defendant one of the 10 largest automotive dealership groups in the U.S.

33.     Defendant's website says it has 11,000 employees and provides "an array of services and products" including marketing services.

**B.     Calls to Plaintiff Wolski**

34.     Plaintiff Wolski is a "person" as defined by 47 U.S.C. § 153(39).

35.     Plaintiff Wolski's telephone number, (XXX) XXX-3777, is assigned to a cellular telephone service.

36.     Plaintiff Wolski's telephone number, (XXX) XXX-3777, is a residential telephone number and not associated with any business.

37.     Plaintiff Wolski purchased two vehicles from Chv Motors, LLC dba Camelback Kia in Phoenix, Arizona (the "Camelback Dealership")—the first car in 2011 and a second one in 2015.

38.     Defendant is an affiliate of the Camelback Dealership as Defendant's parent company, Berkshire Hathaway Automotive, Inc., owns a majority interest in the Camelback Dealership. Dkt. 13 at ¶ 7.

39.     The Camelback Dealership's website https://www.camelbackkia.com / includes a link to Defendant's website, https://www.berkshirehathawayautomotive.com/dealership/camelback-kia.htm, which lists the Camelback Dealership as a dealership within Defendant's automotive group.

40.     In public filings with the Arizona Secretary of State, the Camelback Dealership's mailing address is the same as Defendant's. Additionally, the phone number listed by the Camelback Dealership, 972-536-2900, is a direct line to Defendant's offices.

41.     By 2016, Plaintiff Wolski had ended her relationship with the Camelback Dealership after the Dealership refused to honor her vehicle warranty.

42.     Plaintiff Wolski had no contact with the Defendant for the next two years.

43.     Then, starting in approximately August 2018, Plaintiff Wolski began to receive telephone solicitations on her cellular telephone from the Camelback Dealership regarding promotional offers for new vehicles.

44.     When Plaintiff Wolski answered each of the calls, she noticed a distinctive "click and pause" sound.

45.     Plaintiff Wolski believes she received 3-4 calls starting in August 2018.

46.     The calls continued for a period of approximately seven months, until approximately March 2019.

47.     When Plaintiff Wolski received the marketing calls, she would regularly ask the agent to stop calling her.

48.     On several occasions, Plaintiff Wolski asked to speak with a manager to confirm that her do-not-call requests were being received and processed.

49.     However, the calls continued.

50.     The calls became so frequent and continuous that Plaintiff Wolski's wife contacted Defendant by phone, e-mail, and online demanding that the calls cease.

51.     Eventually, Plaintiff Wolski's wife received a call from a manager of Defendant who apologized for the continued calls and acknowledged that the calls should not have been made because of Plaintiff Wolski's multiple do-not-call requests.

**C.      Calls to the Plaintiff Goodell**

52.     Plaintiff Goodell is a "person" as defined by 47 U.S.C. § 153(39).

53.     Plaintiff Goodell's telephone number, (XXX) XXX-8839, is assigned to a cellular telephone service.

54.     Plaintiff Goodell's telephone number, (XXX) XXX-8839, is a residential telephone number and not associated with any business.

55.     In approximately March 2017, Plaintiff Goodell purchased a vehicle from Showcase Honda, LLC dba Showcase Honda in Phoenix, Arizona ("the Showcase Dealership").

56.     On information and belief, Defendant is an affiliate of the Showcase Dealership as Defendant's parent company, Berkshire Hathaway Automotive, Inc., has an ownership interest in the Showcase Dealership.

57.     The Showcase Dealership's website https://www.showcasehonda.com/ includes a link to Defendant's website, https://www.berkshirehathawayautomotive.com/dealership/showcase-honda.htm, which lists Showcase Honda as a dealership within Defendant's automotive group.

58.     In public filings with the Arizona Secretary of State, the Showcase Dealership's mailing address is the same as Defendant's. Additionally, Showcase Dealership lists a phone number, 972-536-2900, that is a direct line to Defendant's offices.

59.     Plaintiff Goodell's 2017 vehicle purchase was the last transaction Plaintiff Goodell had with the Showcase Dealership.

60.     Starting in approximately July 2019, Plaintiff Goodell began to receive telephone solicitations on his cellular telephone regarding promotional offers for new vehicles at the Showcase Dealership.

61.   Plaintiff Goodell believes he received at least 10 such calls.

62.   When Plaintiff Goodell answered each of the calls, he noticed a distinctive "click and pause" sound.

63.   Based on Plaintiff Goodell's extensive call center experience, he immediately associated the "click and pause" sound with a predictive dialing system.

64.   In fact, Plaintiff Goodell further identified the dialing system as an ATDS based on his experience.

65.   During many of the calls, Plaintiff Goodell asked to no longer receive calls.

66.   On one such call, Plaintiff Goodell spoke with a manager from the Showcase Dealership asking to have the dealership cease calling him.

67.   Additionally, Plaintiff Goodell called the Defendant to demand the calls cease.

68.   However, the calls continued.

69.   Eventually, in March 2020, Plaintiff Goodell posted a negative online review of the Showcase Dealership. Shortly after posting his online review, the calls finally stopped.

**D.   A Pattern of Unwanted Dealership Calls**

70.   Plaintiffs' experiences with unwanted telemarketing calls regarding Defendant's dealerships and automotive franchises is not unique.

71.   Publicly available records show hundreds of consumers are receiving unwanted solicitation calls regarding Defendant's dealerships. Attached hereto as Exhibit A is a composite of screenshots from online complaints consumers have posted regarding unwanted telemarketing calls regarding Defendants' dealerships.

72.   Given the number of online complaints, dating back to 2015, it is reasonable to infer that Defendant is making tens of hundreds, if not thousands of unlawful telemarketing calls.

73.   For example, five years ago, a person named Taylor Whitley posted a negative review about "non-stop telemarketing calls" regarding Showcase Honda:

Showcase Honda
Honda dealer
Camelback East Village
PLACE DETAILS

Taylor Whitley

★ ☆ ☆ ☆ ☆  5 years ago
Non-stop telemarketing calls after I decided not to shop here. Will not remove me from their call list.

74.     Three years ago, a consumer identified as Rhonda G complained about telemarketing calls regarding Bell Honda, a dealership associated with Defendant:



Bell Honda
Honda dealer
Bell Road Autopark
PLACE DETAILS

Rhonda G

★ ☆ ☆ ☆ ☆  3 years ago
Aug 8...they just keep on calling. Jokes in them, I've blocked their number.
Submitted request for pricing via TruCar. Spoke with 1st salesman who called and told them I would contact them when ready to come in. Next day even though I have asked them to stop calling me,  they are still blowing up my phone multiple times a day. What they have accomplished is me blocking their number and never willing to consider them to buy a car now.

75.     Two years ago, Andrew Gibson posted an online complaint about Camelback Hyundai, asking PLEASE STOP CALLING ME:

Camelback Hyundai
Hyundai dealer
Camelback East Village
PLACE DETAILS

Andrew Gibson

★ ★ ★ ★ ★  2 years ago
If I could give a zero I would. Dealership managers very pushy and super annoying getting 5+ calls every day when I say I'm not interested. PLEASE STOP CALLING ME this is getting point where it's harassment, the more you call the more I'm going to tel everyone how much you suck. I never rate anyone but your management is terrible human beings worse than telemarketers and collection agencies. You don't even deserve this 1. I already purchased a vehicle from a dealership that isn't pushy, Honda, and they also didn't try to add these random hidden fees like $600 for a cup holder on a used car because it is after market? Who cares it's used and that's how they brought in, also your coffee was disgusting.

76.    In early 2020, Jake Hewitt posted a negative review about incessant calls regarding Cerritos Nissan, another dealership in Defendant's automotive group:

Cerritos Nissan
Nissan dealer
PLACE DETAILS

Jake Hewitt

★ ★ ★ ★ ★  8 months ago
I don't know how these people got my phone number but they call me nonstop throughout the workday.

**E.    Vicarious Liability under the TCPA**

77.    On information and belief, Defendant maintains a "Business Development Center" from which marketing calls are made on behalf of Defendant's dealerships and automotive franchises.

78.     As stated in a November 19, 2018, press release, Defendant contracted with Century Interactive dba Car Wars Own the Phone ("Car Wars") to provide enterprise-wide CRM, digital marketing, and call-tracking services to Defendant to integrate digital leads and phone call data management. The press release explains that Car Wars "leverages human reviews, artificial intelligence and CRISP metrics to equip dealerships with everything they need to OWN THE PHONE." https://www.prweb.com/releases/car_wars_acquires_vistadash_to_amplify_transparency _in_automotive/prweb15928253.htm (last visited October 29, 2020).

79.     Defendant's relationship with Car Wars enables it to direct and control its dealerships' telemarketing campaigns to consumers.

80.     The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 F.C.C. Rcd. 12391, 12397 (¶ 13) (1995).

81.     In its January 4, 2008, ruling, the FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *Id.* (specifically recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

82.     On May 9, 2013, the FCC confirmed this principle in a Declaratory Ruling holding that a defendant may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of

11

1    'independent' marketers, suing one or a few of them is unlikely
     to make a substantive difference for consumer privacy.

2    *May 2013 FCC Ruling*, 28 F.C.C. Rcd. at 6588 (¶ 37) (internal citations omitted).

3        83.    More specifically, the May 2013 FCC Ruling held that, even in the

4    absence of evidence of a formal contractual relationship between the seller and the

5    telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if

6    not actual) authority" to make the calls.  28 F.C.C. Rcd. at 6586 (¶ 34).

7        84.    The May 2013 FCC Ruling rejected a narrow view of TCPA liability,

8    including the assertion that a seller's liability requires a finding of formal agency and

9    immediate direction and control over the third-party who placed the telemarketing call.

10   *Id.* at 6587 n. 107.

11       85.    The May 2013 FCC Ruling further clarifies the circumstances under

12   which a telemarketer has apparent authority:

13           [A]pparent authority may be supported by evidence that the
14           seller allows the outside sales entity access to information and
             systems that normally would be within the seller's exclusive
15           control, including: access to detailed information regarding the
             nature and pricing of the seller's products and services or to the
16           seller's customer information. The ability by the outside sales
             entity to enter consumer information into the seller's sales or
17           customer systems, as well as the authority to use the seller's
             trade name, trademark and service mark may also be relevant.
18           It may also be persuasive that the seller approved, wrote or
             reviewed the outside entity's telemarketing scripts.  Finally, a
19           seller would be responsible under the TCPA for the
             unauthorized conduct of a third-party telemarketer that is
20           otherwise authorized to market on the seller's behalf if the
             seller knew (or reasonably should have known) that the
21           telemarketer was violating the TCPA on the seller's behalf and
             the seller failed to take effective steps within its power to force
22           the telemarketer to cease that conduct.

23   28 F.C.C. Rcd. at 6592 (¶ 46).

24       86.    Defendant accepted and received profits from illegal calls its agents made.

25       87.    Defendant maintained control over the actions of and instructed its agents.

26       88.    Defendant permitted the car dealerships to "access [ ] information and

27   systems that normally would be within the seller's exclusive control" by allowing the

28   dealerships to access the Car Wars CRM.

89.     In fact, it is believed that Defendant required the dealerships to use the Car Wars CRM to make calls based on the fact that multiple dealerships of theirs used it to make calls.

90.     Through the CRM system, Defendant provides its car dealerships with the telephone numbers to call.

91.     In fact, with many CRMs, it is the system itself that is making the call. In other words, Defendant is likely providing the dialing system used to make the calls.

92.     Through their access to the CRM system, Defendant was on knowledge of and received complaints from individuals who did not want to be called any longer.

**F.     Defendant's Dialing System**

93.     The calls to both Plaintiffs were made with an ATDS, as that term is defined by the TCPA.

94.     Before the calls would connect there was a distinctive "click and pause" sound, which is associated with a predictive dialing system.

95.     Plaintiff Goodell further identified the dialing system as an ATDS based on his extensive call center experience.

96.     The pause signifies the algorithm of the predictive dialer operating. The predictive dialer dials thousands of numbers at once, and only transfers the call to a live agent once a human being is on the line.

97.     On information and belief, the dialing system used by Defendant also has the capacity to store telephone numbers in a database and dial them automatically with no human intervention.

98.     Loading a list of telephone numbers into the dialing system and pressing a single command does this.

99.     On information and belief, the dialing system can also produce numbers using a sequential number generator and dial them automatically.

100.    The dialing system can do this by inputting a straightforward computer command.

101. Following that command, the dialing system will sequentially dial numbers.

102. First, the system would dial a number such as (555) 000-0001, then (555) 000-0002, and so on.

103. This would be done without any human intervention or further effort.

104. Plaintiffs have suffered actual injury because of Defendant's telemarketing telephone calls, including, but not limited to:

- Reduced device storage;
- Lost time tending to and responding to the calls;
- Mental energy;
- Invasion of privacy;
- Nuisance;
- Deprivation of the right to request, receive, and act in accordance with the mandated "do not call" policy to stop further calls; and
- Increased risk of all the above.

## VI.  CLASS ACTION ALLEGATIONS

105. As authorized by Rule 23(b)(2) or (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of a class of all other persons or entities similarly situated throughout the United States.

106. Plaintiff brings this action under Fed. R. Civ. P. 23 on behalf of two National Classes (collectively referred to as "Classes"), defined as follows:

> **Dialer Class**:  Since the four years prior to the filing of the Complaint through the date of trial, (1) Plaintiffs and all persons within the United States to whose cellular telephone number (2) Defendant placed (or had placed on its behalf) a call using (3) substantially similar dialing equipment and/or software used to place telephone calls to Plaintiffs (4) without the prior express written consent of the called party.

> **Policy Class**: Since the four years prior to the filing of the Complaint through the date of trial (1) Plaintiffs and all persons within the United States to whose telephone number (2) Defendant placed (or had placed on its behalf) two or more telemarketing telephone calls (3) within a 12-month period.

14

107.    Excluded from the Classes are Defendant and any entities in which Defendant has a controlling interest; Defendant's agents and employees; any Judge and Magistrate Judge to whom this action is assigned and any member of their staffs and immediate families, and any claims for personal injury, wrongful death, and/or emotional distress.

108.    **Numerosity**: The members of the Classes for whose benefit this action is brought are so numerous that joinder of all members is impracticable as the type of dialing software used by the Defendant is meant for *en masse* calling.

109.    **Ascertainability**: The exact number and identities of the persons who fit within the Classes are ascertainable in that Defendant maintains written and electronically stored data showing:

        a.    The time period(s) during which Defendant placed telephone calls;

        b.    The telephone numbers to which Defendant placed telephone calls;

        c.    The dates Defendant placed telephone calls to each class member;

        d.    The names and addresses of Class members;

        e.    The equipment Defendant used to call Class members.

110.    **Commonality**: There are common questions of law and fact affecting the rights of the Members of the Classes, including, *inter alia*, the following:

        a.    Whether Defendant made telemarketing calls;

        b.    Whether Defendant used an automatic telephone dialing system;

        c.    Whether Defendant obtained prior express written consent and/or tracked revocation of such consent;

        d.    Whether Defendant maintained a written "do not call" policy;

        e.    Whether Defendant trained its employees or agents engaged in telemarketing on the existence and usage of any "do not call" policy;

        f.    Whether Defendant recorded or honored "do not call" requests;

        g.    Whether Plaintiffs and the Classes were damaged thereby, and the extent of damages for such violations; and

h.      Whether Defendant should be enjoined from engaging in such conduct in the future.

111.   **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Classes in that they arise from Defendant's uniform conduct and are based on the same legal theories as these claims.

112.   Plaintiffs are members of the Dialer Class and their claims are typical of Dialer Class members because Defendant placed telephone calls to their cellular telephones using an automatic telephone dialing system without their consent.

113.   Plaintiffs are a member of and their claims are typical of the Policy Class because Defendant placed two or more calls for telemarketing purposes in a one-year period to their telephone number without having the required policies, procedures, and training in place.

114.   Plaintiffs and all putative Class members also have necessarily suffered concrete injury, as all members spent time tending to Defendant's calls, lost space on their devices, had their telephone lines tied up, and suffered a nuisance and an invasion of their privacy as they were unable to effectively stop the calls if they wanted to do so, or obtain a "do not call policy" upon which they could rely to stop the calls.

115.   With respect to the Policy Class specifically, Defendant's failures to abide by those regulations also increased the risk of harm (such as nuisance and invasion of privacy) to Plaintiffs and Policy Class members.

116.   **Adequacy**: Plaintiffs have no interests antagonistic to, or in conflict with, the Classes.

117.   Plaintiffs will thoroughly and adequately protect the interests of the Classes, having retained qualified and competent legal counsel to represent themselves and the Classes.

118.   Defendant has acted and refused to act on grounds generally applicable to the Classes, thereby making injunctive and declaratory relief appropriate for the Classes.

119.    The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications.

120.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy since, *inter alia*, the damages suffered by each class member make individual actions uneconomical.

121.    Common questions will predominate, and there will be no unusual manageability issues.

**FIRST CAUSE OF ACTION**
**Violations of the TCPA, 47 U.S.C. § 227(b)**
**(On Behalf of Plaintiffs and the Dialer Class)**

122.    Plaintiffs and the proposed Dialer Class incorporate the foregoing allegations as if fully set forth herein.

123.    Defendant placed numerous calls for telemarketing purposes to Plaintiffs and Dialer Class members' cellular telephone numbers.

124.    Defendant did so using an automatic telephone dialing system.

125.    Defendant did so without the prior express written consent of Plaintiffs and Dialer Class members.

126.    Plaintiffs and Dialer Class members are entitled to an award of $500 in statutory damages telephone call pursuant to 47 U.S.C. § 227(b)(3), in addition to and separate from any award related to Defendant's failure to maintain policies and procedures for an internal do-not-call list.

127.    Plaintiffs and Dialer Class members are entitled to an award of treble damages in an amount up to $1,500 telephone call, in addition to and separate from any award related to Defendant's failure to maintain policies and procedures for an internal do-not-call list, because Defendant's violations were knowing and/or willful.

**SECOND CAUSE OF ACTION**
**Violations of the TCPA, 47 U.S.C. § 227(c)**
**(On Behalf of Plaintiffs and the Policy Class)**

128.    Plaintiffs and the proposed Policy Class incorporate the foregoing allegations as if fully set forth herein.

129.    Defendant placed numerous calls for telemarketing purposes to Plaintiffs' and Policy Class members' telephone numbers.

130.    Defendant did so despite not having a written policy pertaining to "do not call" requests.

131.    Defendant did so despite not having such a policy available "upon demand."

132.    Defendant did so despite not training its personnel on the existence or use of any internal "do not call" list or policy.

133.    Defendant did so despite not recording or honoring "do not call" requests.

134.    Defendant placed two or more telephone calls to Plaintiffs and Policy Class members in a 12-month period.

135.    Plaintiffs and Policy Class members are entitled to an award of $500 in statutory damages telephone call pursuant to 47 U.S.C. § 227(c)(5), in addition to and separate from any award for damages related to Defendant's calls using an automatic telephone dialing system.

136.    Plaintiffs and Policy Class members are entitled to an award of treble damages in an amount up to $1,500 per telephone call because Defendant's violations were knowing and/or willful.

**VII.  PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of the Classes, pray for the following relief:

A.    An order certifying the Classes as defined above, appointing Plaintiffs Goodell and Wolski as the representatives of the Classes and appointing their counsel as Class Counsel;

18

B.      An order declaring that Defendant's actions, as set out above, violate 47 U.S.C. § 227(b) and § 227(c);

C.      An award of injunctive and other equitable relief as necessary to protect the interests of the Classes, including, *inter alia*, an order prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

D.      An award of statutory damages for each violation of 227(b) and (c) and the regulations promulgated thereunder;

E.      An award of treble damages;

F.      An award of reasonable attorneys' fees and costs; and

G.      Such other and further relief that the Court deems reasonable and just.

## VIII.  <u>JURY DEMAND</u>

**Plaintiffs request a jury trial as to all claims of the complaint so triable.**

DATED this 29th day of October, 2020.

By: <u>s/ *Mary C. Turke*</u>
     Mary C. Turke, *Admitted Pro Hac Vice*
     TURKE & STRAUSS LLP
     613 Williamson Street, Suite 201
     Madison, WI 53703
     Telephone: (608) 237-1775
     Facsimile:  (608) 509-4423
     mary@turkestrauss.com

     Lynn A. Toops, *Pro Hac Vice Pending*
     Lisa M. La Fornara, *Pro Hac Vice Pending*
     COHEN & MALAD, LLP
     One Indiana Square
     Suite 1400
     Indianapolis, IN 46204
     Telephone: (317) 636-6481
     ltoops@cohenandmalad.com
     llafornara@cohenandmalad.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Nathan Brown (State Bar No. 033482)
BROWN PATENT LAW
15100 N 78th Way, Suite 203
Scottsdale, AZ 85260
Telephone: (602) 529-3474
Nathan.Brown@BrownPatentLaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Mary C. Turke, hereby certify that on October 29, 2020, I electronically field the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Darrell E. Davis
Zachary R. Fort
CLARK HILL PLC – SCOTTSDALE, AZ
14850 N Scottsdale Rd., Suite 500
Scottsdale, AZ 85254
Telephone: (480) 684-1100
ddavis@clarkhill.com
zfort@clarkhill.com

DATED this 29th day of October, 2020.

By: s/ *Mary C. Turke*
Mary C. Turke, *Admitted Pro Hac Vice*
TURKE & STRAUSS LLP
613 Williamson Street, Suite 201
Madison, WI 53703
Telephone: (608) 237-1775
Facsimile:  (608) 509-4423
mary@turkestrauss.com

*Attorneys for Plaintiffs*