Raina C. Borrelli, *Admitted Pro Hac Vice*
Mary C. Turke, *Admitted Pro Hac Vice*
TURKE & STRAUSS LLP
613 Williamson Street, Suite 201
Madison, WI 53703
Telephone: (608) 237-1775
raina@turkestrauss.com
mary@turkestrauss.com

Lynn A. Toops, *Pro Hac Vice*
Lisa M. La Fornara, *Pro Hac Vice*
COHEN & MALAD, LLP
One Indiana Square
Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ltoops@cohenandmalad.com
llafornara@cohenandmalad.com

[Additional Counsel Appear on Signature Page]

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Goodell and Kerri Wolski, individually and on behalf of a class of all persons and entities similarly situated, <br><br> Plaintiffs, <br> v. <br><br> BH Automotive, LLC; Chvt Motors, LLC dba Camelback Kia; and Showcase Motors, LLC dba Showcase Honda <br><br> Defendants. | Case No. 2:20-cv-01657-JJT <br><br> **PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT** |

## PRELIMINARY STATEMENT

1.      Plaintiffs Brian Goodell and Kerri Wolski bring this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in response to widespread public outrage about the proliferation of intrusive,

1

nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs.*, *LLC,* 132 S. Ct. 740, 745 (2012).

2.     Plaintiffs allege that Defendants BH Automotive, LLC ( "BHA")), Chvt Motors, LLC dba Camelback Kia ("Camelback Kia"), and Showcase Honda, LLC dba Showcase Honda ("Showcase Honda") (collectively "Defendants") facilitated and are responsible for placing or directing telemarketing calls to numbers that had previously requested not to be called.

3.     Plaintiffs and class members never consented to receive these calls. Defendants nonetheless engaged in a nationwide telemarketing campaign designed to sell their products to consumers. Because this telemarketing campaign placed calls to many thousands of potential customers *en masse*, Plaintiffs bring this action on behalf of a proposed nationwide class of other persons who received illegal telemarketing calls from or on behalf of Defendants.

## PARTIES

4.     Plaintiff Kerri Wolski is a resident of Mesa, Arizona, in this District.

5.     Plaintiff Brian Goodell is a resident of Mesa, Arizona, in this District.

6.     Defendant BH Automotive, LLC is a Delaware limited liability company with its principal place of business at 8333 Royal Ridge Parkway, Suite 100 in Irving, Texas.

7.     Defendant Chvt Motors, LLC dba Camelback Kia is a Delaware limited liability company with its principal place of business at 8333 Royal Ridge Parkway, Suite 100 in Irving, Texas and its Arizona business address at 1450 E. Camelback Rd., Phoenix, Arizona, 85014.

8.     Defendant Showcase Motors, LLC dba Showcase Honda is a Delaware limited liability company with its principal place of business at 8333 Royal Ridge Parkway, Suite 100 in Irving, Texas and its Arizona business address at 1333 E. Camelback Rd., Phoenix, Arizona 85014.

9.     Defendant BHA holds itself out and does business as "Berkshire Hathaway Automotive." Defendant BHA's website (in its predecessor's name, Van Tuyl Group LLC), http://www.vantuylgroup.com automatically redirects to https://www.berkshirehathawayautomotive.com/.

10.     Van Tuyl Group, LLC, the predecessor entity to BHA, has registered the trade name, "Berkshire Hathaway Automotive" with the Arizona Secretary of State and states the nature of its business is "CONSULTING SERVICES TO AUTOMOBILE DEALERSHIPS." BHA's phone number for this registration is 972-536-2900. Area code 972 is associated with Irving, Texas, where its headquarters are located.

11.     BHA is wholly owned by Berkshire Hathaway Automotive, Inc.

12.     Camelback Kia and Showcase Honda are car dealerships that are wholly owned by Berkshire Hathaway Automotive, Inc.

13.     Defendants or their agents make telemarketing calls from and/or into this District, including to Plaintiffs.

**JURISDICTION & VENUE**

14.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the Plaintiffs' claims arise under federal law.

15.     Venue is proper under 28 U.S.C. § 1391(b)(2) because the calls that were initiated to Plaintiffs and the putative class that are the subject of the litigation were made from and/or into this District. As such, a substantial part of the events giving rise to the claims occurred in this District.

**TCPA BACKGROUND**

16.     The TCPA was passed in 1991 to help prevent unwanted telephone calls and solicitations, provide power to consumers to prevent unwanted solicitations, and rein in unrestricted telemarketing. *See* 47 U.S.C. § 227, *et seq.*

3

17.     § 227(c) of the TCPA requires the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

18.     The FCC was instructed to "compare and evaluate alternative methods and procedures (including the use of . . . company-specific 'do not call systems . . .)" and "develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish purposes of this section." Id. at (c)(1)(A), (E).

19.     Pursuant to this statutory mandate, the FCC established company-specific "do not call" rules. In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 7 F.C.C. Rcd. 8752 (Oct. 16, 1992) ("TCPA Implementation Order").

20.     These regulations are codified at 47 C.F.R. §§ 64.1200(d)(1)-(7).

21.     Specifically, these regulations require a company to keep a written policy, available upon demand, for maintaining a do-not-call list, train personnel engaged in telemarketing on the existence and use of its internal do-not-call list, and record and honor "do not call" requests for no less than five years from the time the request is made. 47 C.F.R. §§ 64.1200(d)(1, 2, 3, 6).

22.     This includes the requirement that "[a] person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a

4

telephone number or address at which the person or entity can be contacted." 47 C.F.R. § 64.1200(d)(4).

23.     These policies and procedures prohibit a company from making telemarketing calls unless they have implemented these policies and procedures. 47 C.F.R. § 64.1200(d).

24.     A violation of § 227(c) through 47 C.F.R. § 64.1200(d) carries statutory damages of $500 to $1,500 per call.

25.     Though some of these requirements mention "residential" telephones, they were all extended to cover calls to cellular telephones as well as residential telephones. 47 CFR § 64.1200(e).

## FACTUAL ALLEGATIONS

**Defendants**

26.     BHA, Camelback Kia, and Showcase Honda are each a "person" as the term is defined by 47 U.S.C. § 153(39).

27.     BHA is wholly owned by Berkshire Hathaway Automotive, Inc. BHA shares a CEO (Jeff Rachor) and CAO (Delwyn James) with Berkshire Hathaway Automotive, Inc.

28.     BHA's website, https://www.berkshirehathawayautomotive.com/about/history, says Berkshire Hathaway Automotive is one of the largest car dealership groups in America, operating 85 dealerships and 100 automotive franchises, making it one of the 10 largest automotive dealership groups in the U.S.

29.     BHA's website says it has 11,000 employees and provides "an array of services and products" including marketing services.

30.     The "Careers" page on BHA's website has job listings for positions at dealerships (such as service technicians and sales associates) as well as for positions providing "management consulting services" to its dealerships.

31.

32.     Camelback Kia and Showcase Honda are car dealerships owned by Berkshire Hathaway Automotive, Inc.

**Calls from Camelback Kia to Plaintiff Wolski**

33.     Plaintiff Wolski is a "person" as defined by 47 U.S.C. § 153(39).

34.     Plaintiff Wolski's telephone number, (XXX) XXX-8489, is assigned to a cellular telephone service.

35.     Plaintiff Wolski's telephone number, (XXX) XXX-8489, is a residential telephone number and not associated with any business.

36.     Plaintiff Wolski purchased two vehicles from Chv Motors, LLC dba Camelback Kia in Phoenix, Arizona—the first car in 2011 and a second one in 2015.

37.     BHA's parent company, Berkshire Hathaway Automotive, Inc., owns a majority interest in Camelback Kia. Dkt. 13 at ¶ 7.

38.     Camelback Kia's website, https://www.camelbackkia.com /,  includes a link to Berkshire Hathaway Automotive, Inc.'s website, https://www.berkshirehathawayautomotive.com/dealership/camelback-kia.htm, which lists Camelback Kia as a dealership within Berkshire Hathaway Automotive, Inc.'s automotive group.

39.     In public filings with the Arizona Secretary of State, Camelback Kia's mailing address is the same as BHA and Berkshire Hathaway Automotive, Inc.'s. Additionally, the phone number listed by the Camelback Dealership, 972-536-2900, is a direct line to BHA and Berkshire Hathaway Automotive, Inc.'s offices.

40.     By 2016, Plaintiff Wolski had ended her relationship with Camelback Kia after the Dealership refused to honor her vehicle warranty.

41.     Plaintiff Wolski had no contact with BHA, Camelback Kia, or Berkshire Hathaway Automotive, Inc. for the next two years.

42.     Then, starting in approximately August 2018, Plaintiff Wolski began to receive telephone solicitations on her cellular telephone from Camelback Kia regarding promotional offers for new vehicles.

43.     Plaintiff Wolski believes she received 3-4 calls starting in August 2018.

44.     The calls continued for a period of approximately seven months, until approximately March 2019.

45.     When Plaintiff Wolski received the marketing calls, she would regularly ask the agent to stop calling her.

46.     On several occasions, Plaintiff Wolski asked to speak with a manager to confirm that her do-not-call requests were being received and processed.

47.     However, the calls continued.

48.     The calls became so frequent and continuous that Plaintiff Wolski's wife contacted Camelback Kia, BHA, and Berkshire Hathaway Automotive, Inc. by phone, e-mail, and online demanding that the calls cease.

49.     Eventually, Plaintiff Wolski's wife received a call from a manager of BHA who apologized for the continued calls and acknowledged that the calls should not have been made because of Plaintiff Wolski's multiple do-not-call requests.

**Calls to Plaintiff Goodell**

50.     Plaintiff Goodell is a "person" as defined by 47 U.S.C. § 153(39).

51.     Plaintiff Goodell's telephone number, (XXX) XXX-8839, is assigned to a cellular telephone service.

52.     Plaintiff Goodell's telephone number, (XXX) XXX-8839, is a residential telephone number and not associated with any business.

53.     In approximately March 2017, Plaintiff Goodell purchased a vehicle from Showcase Honda, LLC dba Showcase Honda in Phoenix, Arizona.

7

54.     On information and belief, BHA's parent company, Berkshire Hathaway Automotive, Inc., has an ownership interest in Showcase Honda.

55.     Showcase Honda's website https://www.showcasehonda.com/ includes a link to Berkshire Hathaway Automotive, Inc.'s website, https://www.berkshirehathawayautomotive.com/dealership/showcase-honda.htm, which lists Showcase Honda as a dealership within Berkshire Hathaway Automotive, Inc.'s automotive group.

56.     In public filings with the Arizona Secretary of State, Showcase Honda's mailing address is the same as BHA and Berkshire Hathaway Automotive, Inc.'s. Additionally, Showcase Honda lists a phone number, 972-536-2900, that is a direct line to BHA and Berkshire Hathaway Automotive, Inc.'s offices.

57.     Plaintiff Goodell's 2017 vehicle purchase was the last transaction Plaintiff Goodell had with Showcase Honda.

58.     Starting in approximately July 2019, Plaintiff Goodell began to receive telephone solicitations on his cellular telephone regarding promotional offers for new vehicles at Showcase Honda.

59.     Plaintiff Goodell believes he received at least 10 such calls.

60.     During many of the calls, Plaintiff Goodell asked to no longer receive calls.

61.     On one such call, Plaintiff Goodell spoke with a manager from Showcase Honda asking to have the dealership cease calling him.

62.     Additionally, Plaintiff Goodell called BHA to demand the calls cease.

63.     However, the calls continued.

64.     Eventually, in March 2020, Plaintiff Goodell posted a negative online review of Showcase Honda. Shortly after posting his online review, the calls finally stopped for some time.

65.     However, Plaintiff Goodell received another telephone solicitation from Showcase Honda in March 2022.

**A Pattern of Unwanted Dealership Calls**

66.     Plaintiffs' experiences with unwanted telemarketing calls from Defendants are not unique.

67.     Publicly available records show hundreds of consumers are receiving unwanted solicitation calls regarding BHA and Berkshire Hathaway, Inc.'s dealerships. Attached hereto as Exhibit A is a composite of screenshots from online complaints consumers have posted regarding unwanted telemarketing calls regarding the dealerships.

68.     Given the number of online complaints, dating back to 2015, it is reasonable to infer that Defendants are making tens of hundreds, if not thousands of unlawful telemarketing calls.

69.     For example, five years ago, a person named Taylor Whitley posted a negative review about "non-stop telemarketing calls" regarding Showcase Honda:



Showcase Honda
Honda dealer
Camelback East Village
PLACE DETAILS

Taylor Whitley
★☆☆☆☆ 5 years ago
Non-stop telemarketing calls after I decided not to shop here. Will not remove me from their call list.

70.     Three years ago, a consumer identified as Rhonda G complained about telemarketing calls regarding Bell Honda, a dealership associated with BHA:

1
2
3
4
5
6
7
8
9

**Bell Honda**
Honda dealer
Bell Road Autopark
PLACE DETAILS

Rhonda G

★☆☆☆☆ 3 years ago

Aug 8...they just keep on calling. Jokes in them, I've
blocked their number.
Submitted request for pricing via TruCar. Spoke with
1st salesman who called and told them I would contact
them when ready to come in. Next day even though I
have asked them to stop calling me,  they are still
blowing up my phone multiple times a day. What they
have accomplished is me blocking their number and
never willing to consider them to buy a car now.

10      71.    Two years ago, Andrew Gibson posted an online complaint about

11   Camelback Hyundai, asking PLEASE STOP CALLING ME:

12
13
14
15

**Camelback Hyundai**
Hyundai dealer
Camelback East Village
PLACE DETAILS

16
17
18
19
20
21
22
23
24

Andrew Gibson

★☆☆☆☆ 2 years ago

If I could give a zero I would. Dealership managers very
pushy and super annoying getting 5+ calls every day
when I say I'm not interested. PLEASE STOP CALLING
ME this is getting point where it's harassment, the
more you call the more I'm going to tel erveryone how
much you suck. I never rate anyone but your
management is terrible human beings worse than
telemarketers and collection agencies. You don't even
deserve this 1. I already purchased a vehicle from a
dealership that isn't pushy, Honda, and they also didn't
try to add these random hidden fees like $600 for a cup
holder on a used car because it is after market? Who
cares it's used and that's how they brought in, also your
coffee was disgusting.

25      72.    In early 2020, Jake Hewitt posted a negative review about incessant calls

26   regarding Cerritos Nissan, another dealership in BHA and Berkshire Hathaway

27   Automotive, Inc.'s automotive group:

28                                          10

**BHA's Vicarious Liability under the TCPA**

73.     The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 F.C.C. Rcd. 12391, 12397 (¶ 13) (1995).

74.     In its January 4, 2008, ruling, the FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *Id.* (specifically recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

75.     On May 9, 2013, the FCC confirmed this principle in a Declaratory Ruling holding that a defendant may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of

11

'independent' marketers, suing one or a few of them is unlikely
to make a substantive difference for consumer privacy.

*May 2013 FCC Ruling*, 28 F.C.C. Rcd. at 6588 (¶ 37) (internal citations omitted).

76.     More specifically, the May 2013 FCC Ruling held that, even in the absence

of evidence of a formal contractual relationship between the seller and the telemarketer, a

seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual)

authority" to make the calls.  28 F.C.C. Rcd. at 6586 (¶ 34).

77.     The May 2013 FCC Ruling rejected a narrow view of TCPA liability,

including the assertion that a seller's liability requires a finding of formal agency and

immediate direction and control over the third-party who placed the telemarketing call.

*Id.* at 6587 n. 107.

78.     The May 2013 FCC Ruling further clarifies the circumstances under which

a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the
> seller allows the outside sales entity access to information and
> systems that normally would be within the seller's exclusive
> control, including: access to detailed information regarding the
> nature and pricing of the seller's products and services or to the
> seller's customer information. The ability by the outside sales
> entity to enter consumer information into the seller's sales or
> customer systems, as well as the authority to use the seller's
> trade name, trademark and service mark may also be relevant.
> It may also be persuasive that the seller approved, wrote or
> reviewed the outside entity's telemarketing scripts.  Finally, a
> seller would be responsible under the TCPA for the
> unauthorized conduct of a third-party telemarketer that is
> otherwise authorized to market on the seller's behalf if the
> seller knew (or reasonably should have known) that the
> telemarketer was violating the TCPA on the seller's behalf and
> the seller failed to take effective steps within its power to force
> the telemarketer to cease that conduct.

28 F.C.C. Rcd. at 6592 (¶ 46).

79.     BHA and its parent company, Berkshire Hathaway Automotive, Inc., own a

majority stake in Camelback Kia and Showcase Honda.

80.     Camelback Kia's website, https://www.camelbackkia.com/, includes a link

to BHA's website,

https://www.berkshirehathawayautomotive.com/dealership/camelback-kia.htm, which
lists the Camelback Dealership as a dealership within BHA and Berkshire Hathaway,
Inc.'s automotive group.

81.    In public filings with the Arizona Secretary of State, Camelback Kia's
mailing address is the same as BHA's. Additionally, the phone number listed by
Camelback Kia, 972-536-2900, is a direct line to BHA's offices.

82.    Showcase Honda's website https://www.showcasehonda.com/ includes a
link to BHA's website,
https://www.berkshirehathawayautomotive.com/dealership/showcase-honda.htm, which
lists Showcase Honda as a dealership within Berkshire Hathaway Automotive, Inc. and
BHA's automotive group.

83.    In public filings with the Arizona Secretary of State, Showcase Honda's
mailing address is the same as BHA and Berkshire Hathaway's. Additionally, Showcase
Honda lists a phone number, 972-536-2900, that is a direct line to BHA's offices.

84.    Although BHA contends that its only relationship with Camelback Kia and
Showcase Honda is as a management consultant that provides consulting services on
topics including marketing. However, BHA's involvement in, and control over,
Camelback Kia's and Showcase Honda's marketing (including telemarketing) is
significant.

85.    BHA contracts with Century Interactive dba Car Wars Own the Phone
("Car Wars") to provide enterprise-wide customer relationship management (CRM),
digital marketing, and call-tracking services to integrate digital leads and phone call data
management. Car Wars "leverages human reviews, artificial intelligence and CRISP
metrics to equip dealerships with everything they need to OWN THE PHONE."
https://www.prweb.com/releases/car_wars_acquires_vistadash_to_amplify_transparency
_in_automotive/prweb15928253.htm (last visited October 29, 2020).

86.     BHA's relationship with Car Wars enables it to direct and control its dealerships' telemarketing campaigns to consumers. BHA licenses "call measurement services" from Car Wars

87.     BHA provides Camelback Kia and Showcase Honda with the Car Wars CRM program called Dealer Socket. The Dealer Socket program facilitates the dealerships' telemarketing activity by providing lead management, analytics, and call tracking. BHA's dealerships, including Camelback Kia and Showcase Honda, are required to use Dealer Socket as their CRM platform. BHA has full access to both Camelback Kia's and Showcase Honda's Dealer Socket platforms and can access all information about telemarketing calls made by the dealerships through Dealer Socket. In fact, BHA can request any and all information captured by Dealer Socket from Car Wars at any time, without the dealerships' consent or knowledge.

88.     For example, Car Wars captures recordings of all outbound calls by Camelback Kia and Showcase Honda, which BHA can request or access at any time.

89.     BHA employees are in regular contact with Camelback Kia and Showcase Honda regarding the dealerships' marketing activities, including telemarketing. BHA employees physically visit the dealerships on a regular basis and review the dealerships' marketing plans.

90.     Additionally, BHA sets marketing goals and benchmarks for Camelback Kia and Showcase Honda, including the number of telemarketing calls the dealerships' service advisors are required to make per day.

91.     Camelback Kia and Showcase Honda are required to provide BHA with monthly reports on their marketing activities, including telemarketing, that show the number of telemarketing calls each service advisor places each day.

92.     BHA provides a telemarketing policy to its dealerships, including Camelback Kia and Showcase Honda, that addresses TCPA compliance requirements, That policy states, "As an employee of a Berkshire Hathaway Automotive affiliated

dealership, you are expected to maintain the highest level of honesty and integrity in all of your dealings…" and provides scripts for the dealerships to use when making outbound telemarketing calls.

93.     Thus, BHA was fully aware of, authorized, and facilitated the calling activities in which Camelback Kia and Showcase Honda engaged in.

94.     Moreover, whatever formal protocols may have existed with regard to the telemarketing, BHA's policies and procedures for TCPA compliance were clearly insufficient, as seen by the repeated violations committed by Camelback Kia and Showcase Honda to Plaintiffs. Notably, prior to August 2021, Defendants did not have a policy that dictated when and how to add telephone numbers to their internal do not call list, and DealerSocket did not have a field (beyond a general notes section) to identify when a telephone number has asked to no longer be contacted.

95.     In addition to managing and dictating the dealerships' marketing practices, BHA provided Camelback Kia and Showcase Honda with leads to contact via telephone. BHA engages in significant advertising aimed at identifying potential customers, and it shares that information with its dealerships with the expectation that they will contact those leads, including by telephone. BHA also assists Camelback Kia and Showcase Honda in obtaining leads by contracting for lead sharing through third parties, such as Auto IQ and True Car. These contracts are entered into between BHA and third parties like Auto IQ, True Car, and Autotrader for the benefit of Camelback Kia and Showcase Honda. These leads are then loaded into DealerSocket for use by the dealerships' employees.

96.     BHA then tracks whether the dealerships are following up on and contacting those leads that it has provided to them. As part of that process, BHA sets up automated reminders in DealerSocket for Camelback Kia and Showcase Honda to remind them to follow up with leads at regular intervals.

97.     BHA not only maintains a direct ownership interest in Camelback Kia and Showcase Honda through its parent company Berkshire Hathaway Automotive, Inc., but requires those dealerships to pay BHA a monthly "consulting fee" as well as a percentage of their monthly profits. In turn, the dealerships must provide BHA with access to their personnel, facilities, data, and information, including DealerSocket and their CRM analytics.

98.     BHA accepted and received profits from illegal calls made by Camelback Kia and Showcase Honda.

99.     BHA maintained control over the actions of and instructed its agents, Camelback Kia and Showcase Honda.

100.    BHA permitted Camelback Kia and Showcase Honda to "access [ ] information and systems that normally would be within the seller's exclusive control" by allowing them to access the Car Wars CRM, providing them with leads, and controlling their marketing practices, including telemarketing.

101.    In fact, as with many CRMs, it is the system itself that is making the call. In other words, BHA provides the dialing system used to make the calls.

102.    Through their access to Camelback Kia's and Showcase Honda's CRM system, BHA was on notice of and received complaints from individuals who did not want to be called any longer.

103.    Based on BHA;s provision of the DealerSocket CRM to Camelback Kia and Showcase Honda, BHA's intimate involvement in and control over the dealerships' marketing activities (including telemarketing), its provision of training and scripts to Camelback Kia and Showcase Honda employees regarding telemarketing, and its ownership stake in Camelback Kia and Showcase Honda, BHA is vicariously liable for the illegal telemarketing of Camelback Kia and Showcase Honda.

## CLASS ACTION ALLEGATIONS

104.    As authorized by Rule 23(b)(2) or (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of a class of all other persons or entities similarly situated throughout the United States.

105.    Plaintiffs bring this action under Fed. R. Civ. P. 23 on behalf of the Class, defined as follows:

> **Internal DNC Class**: All persons in the United States to whom: (a) Defendants (or an agent acting on behalf of Defendants) placed (2) two or more telemarketing calls in a 12-month period, (3) who were not current customers of the Defendants at the time of the call, (4) who had previously asked for the calls to stop and (5) at any time in the period that begins four years before the date of filing this Complaint to trial.

106.    Excluded from the Class are Defendants and any entities in which Defendants have a controlling interest; Defendants' agents and employees; any Judge and Magistrate Judge to whom this action is assigned and any member of their staffs and immediate families, and any claims for personal injury, wrongful death, and/or emotional distress.

107.    **Numerosity**: The members of the Class for whose benefit this action is brought are so numerous that joinder of all members is impracticable as the type of dialing software used by the Defendants is meant for *en masse* calling.

108.    **Ascertainability**: The exact number and identities of the persons who fit within the Class are ascertainable in that Defendants maintain written and electronically stored data showing:

a.    The time period(s) during which Defendants placed telephone calls;

b.    The telephone numbers to which Defendants placed telephone calls;

c.    The dates Defendants placed telephone calls to each class member;

17

d.      The names and addresses of Class members;

109.      **Commonality**: There are common questions of law and fact affecting the rights of the Members of the Class, including, *inter alia*, the following:

a.      Whether Defendants made telemarketing calls;

b.      Whether Defendants obtained prior express written consent and/or tracked revocation of such consent;

c.      Whether Defendants maintained a written "do not call" policy;

d.      Whether Defendants recorded or honored "do not call" requests;

e.      Whether Plaintiffs and the Class were damaged thereby, and the extent of damages for such violations; and

f.      Whether Defendants should be enjoined from engaging in such conduct in the future.

110.      **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Class in that they arise from Defendants' uniform conduct and are based on the same legal theories as these claims.

111.      Plaintiffs are a member of and their claims are typical of the  Internal DNC Class because Defendants placed two or more calls for telemarketing purposes in a one-year period to their telephone number without consent or honoring their do not call requests.

112.      Plaintiffs and all putative Class members also have necessarily suffered concrete injury, as all members spent time tending to Defendants' calls, lost space on their devices, had their telephone lines tied up, and suffered a nuisance and an invasion of their privacy as they were unable to effectively stop the calls if they wanted to do so.

113.      **Adequacy**: Plaintiffs have no interests antagonistic to, or in conflict with, the Class.

114.     Plaintiffs will thoroughly and adequately protect the interests of the Class, having retained qualified and competent legal counsel to represent themselves and the Class.

115.     Defendants have acted and refused to act on grounds generally applicable to the Class, thereby making injunctive and declaratory relief appropriate for the Class.

116.     The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications.

117.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy since, *inter alia*, the damages suffered by each class member make individual actions uneconomical.

118.     Common questions will predominate, and there will be no unusual manageability issues.

### FIRST CAUSE OF ACTION

**Telephone Consumer Protection Act**

**Violations of 47 U.S.C. § 227**

**(On Behalf of Plaintiff and the Internal DNC Class)**

119.     Plaintiffs repeat the prior allegations of this Complaint and incorporate them by reference herein.

120.     Defendants placed numerous calls for telemarketing purposes to Plaintiffs and Internal DNC Class Members' telephone numbers.

121.     Defendants did so despite not recording or honoring "do not call" requests.

122.     Defendants placed two or more telephone calls to Plaintiff and Internal DNC Class members in a 12-month period.

123.     Plaintiffs and Internal DNC Class members are entitled to an award of up to $500 in statutory damages per telephone call pursuant to 47 U.S.C. § 227(c)(5).

124.    Plaintiffs and Internal DNC Class members are entitled to an award of treble damages in an amount up to $1,500 per telephone call, pursuant to 47 U.S.C. § 227(c)(5).

125.    Plaintiffs and the members of the Internal DNC Class are also entitled to and do seek injunctive relief requiring Defendants to enact a written policy pertaining to "do not call" requests, train its personnel on the existence and use of the internal "do not call list," and record and honor "do not call" requests.

## I.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class, pray for the following relief:

A.      Certification of the proposed Class;

B.      Appointment of Plaintiff as representatives of the Class;

C.      Appointment of the undersigned counsel as counsel for the Class;

D.      A declaration that Defendants and/or their affiliates, agents, and/or other related entities' actions complained of herein violated the TCPA;

E.      An order enjoining Defendants to comply with the internal "do not call" policies of the TCPA;

F.      An award to Plaintiffs and the Class of damages, as allowed by law; and

G.      Orders granting such other and further relief as the Court deems necessary, just, and proper.

## JURY DEMAND

**Plaintiffs request a jury trial as to all claims of the complaint so triable.**

DATED this 20th day of April, 2022.

By: */s/ Raina C. Borrelli*
    Raina C. Borrelli, *Admitted Pro Hac Vice*
    Mary C. Turke, *Admitted Pro Hac Vice*
    TURKE & STRAUSS LLP
    613 Williamson Street, Suite 201
    Madison, WI 53703
    Telephone: (608) 237-1775
    Facsimile: (608) 509-4423
    raina@turkestrauss.com
    mary@turkestrauss.com

    Lynn A. Toops, *Pro Hac Vice Pending*
    Lisa M. La Fornara, *Pro Hac Vice Pending*
    COHEN & MALAD, LLP
    One Indiana Square
    Suite 1400
    Indianapolis, IN 46204
    Telephone: (317) 636-6481
    ltoops@cohenandmalad.com
    llafornara@cohenandmalad.com

    Nathan Brown (State Bar No. 033482)
    BROWN PATENT LAW
    15100 N 78th Way, Suite 203
    Scottsdale, AZ 85260
    Telephone: (602) 529-3474
    Nathan.Brown@BrownPatentLaw.com

    *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Raina C. Borrelli, hereby certify that on April 20, 2022, I electronically field the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Darrell E. Davis
> Zachary R. Fort
> CLARK HILL PLC – SCOTTSDALE, AZ
> 14850 N Scottsdale Rd., Suite 500
> Scottsdale, AZ 85254
> Telephone: (480) 684-1100
> ddavis@clarkhill.com
> zfort@clarkhill.com

DATED this 20th day of April, 2022.

> By: s/ *Raina C. Borrelli*
> Raina C. Borrelli, *Admitted Pro Hac Vice*
> Mary C. Turke, *Admitted Pro Hac Vice*
> TURKE & STRAUSS LLP
> 613 Williamson Street, Suite 201
> Madison, WI 53703
> Telephone: (608) 237-1775
> Facsimile: (608) 509-4423
> raina@turkestrauss.com
> mary@turkestrauss.com
>
> *Attorneys for Plaintiffs*